IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF OKLAHOMA

BARBARA ELLIOTT,                    )
                                    )
            Plaintiff,              )
                                    )
v.                                  )          Case No. 07-CV-284-JHP-SAJ
                                    )
AMERICAN AIRLINES, INC.,            )
a Foreign Corporation.              )
                                    )
            Defendant.              )

## ORDER AND OPINION

Before the Court are Defendant American Airline's ("American") Motion for Summary Judgment [Docket No. 27], Plaintiff Barbara Elliott's Response in Opposition [Docket No. 35], and American's Reply [Docket No. 39]. For the reasons set forth below, Defendant's motion is GRANTED.

## BACKGROUND

### A. Undisputed Factual Background[1]

Barbara Elliott worked for American-Airlines for over twenty six-years, until her employment was terminated on August 16, 2005. At the time of her termination, Elliott worked at American's Maintenance and Engineering Base ("the Base") in Tulsa, Oklahoma. Elliott was an hourly employee working as a staff assistant for Rod Blake, and then later for Devin Thompson. As part of her job duties, Elliott was required to keep track of the hours worked by salaried employees. When those salaried employees missed work, Elliott was responsible for creating time entries stating

---

[1]The following facts are either undisputed—ie., not specifically controverted by Elliott in accordance with Local Civil Rule 56.1(c)—or are described in the light most favorable to Elliott. Immaterial facts are omitted.

1

the reasons for their absence in American's time keeping system, AutoTA. Elliott was also responsible for preparing her own time sheets and providing them to the lead secretary to enter into AutoTA. In filling out her time sheets, Elliott was expected to accurately report the time she actually worked. Elliott was also expected to accurately code the time she missed work as vacation,[2] sick time, or FMLA leave, in order to be properly paid as an hourly employee. Elliott was provided a copy of the employee handbook outlining American's policies and procedures, including American's rules regarding attendance, time card fraud, misrepresentation and discrimination. Elliott was aware of American's attendance policy and knew that if she was dishonest about how she recorded her time, her employment with American could be terminated.

American was concerned with increasing occurrences of timecard fraud at the Base. On April 7, 2004, American management sent a letter to its Tulsa employees. (Pl.'s Mot., Exhibit "M".)  The letter highlighted American's concern with timecard fraud and reminded its employees that such fraud was against American policy and could result in termination. On July 23, 2004, American management sent a follow-up letter to its Tulsa employees. (Pl.'s Mot., Exhibit "N".) In this letter, American management again addressed the recurring issue of timecard fraud. The letter established a new policy, effective July 26, 2004, which required all employees to swipe their identification badges through turnstile entrances when entering and exiting the Base. Elliott received both of these letters and was aware of American's concern with timecard fraud.

In December of 2004, following the death of Elliott's father, Elliott's mother moved to Tulsa to live with Elliott. Elliott's mother is partially disabled and requires frequent medical attention.

---

[2]As a long time employee, Elliott received approximately six weeks of vacation time each year, and American allowed her to purchase or borrow a week from the ensuing year, thereby giving her the option of two months of vacation leave. In addition, Elliott received ten sick days a year and could take up to three days for bereavement leave. Elliott always used all her vacation days each year.

Elliott's supervisor at the time, Rod Blake, suggested she apply for FMLA leave for the times when she might have to be away from work to attend to her mother's medical care.[3] On March 5, 2005, Elliott applied for intermittent FMLA for the instances when she needed to leave work to care for her mother. American approved Elliott's request for intermittent FMLA leave beginning March 5, 2005.

In April 2005, Elliott reapplied for intermittent FMLA leave seeking to extend her intermittent FMLA leave through April 2006. American approved this subsequent application for intermittent FMLA.[4] Elliott testified that at the time she was approved for intermittent FMLA, she was aware that if she took time off to care for an eligible family member, such as her mother, she was required to use her accrued vacation before she could take unpaid leave.[5]

Although Elliott had been approved for FMLA leave, she never recorded any of her time

---

[3] Elliott had experience with requesting and taking FMLA leave. In May of 1999, Elliott applied for and was approved for intermittent FMLA leave for herself. Elliott's timecards during this period were properly coded to reflect the times she was and was not taking FMLA leave.

[4] The Court recognizes that Elliott attempts to controvert this statement by reference to ¶ 1 of her "Response to De[f]endant's Undisputed Statement of Material Facts." Pursuant to Local Civil Rule 56.1(c), "[a]ll material facts set forth in the statement of material facts of the movant shall be deemed admitted for the purposes of summary judgment unless specifically controverted by the statement of material facts of the opposing party." An opposing party seeking to dispute the movant's statements of material fact must set forth "a concise statement of material facts to which the party asserts genuine issues of fact exist." *Id.* "Each fact shall be numbered, shall refer with particularity to those portions of the record upon which the opposing party relies and, if applicable, shall state the numbered paragraphs of the movant's facts that are disputed." *Id.*

Nothing in Elliott's response, however, alleges facts specifically controverting American's statement that Elliott's April 2005 FMLA request was approved. The factual allegations Elliott makes in  ¶ 1 deal only with the alleged agreement between Elliott and her supervisor Rodney Blake. There does , however, appear to be a factual dispute as to the scope of the approved FMLA leave—ie. whether Elliott was authorized to take FMLA whenever she desired or whether she was only authorized to take leave once a month for two to four hours. The Court, therefore, only deems undisputed the statement by American that Elliott was approved for FMLA leave.

[5] The Court recognizes that Elliott attempts to controvert this statement with reference to ¶ 1 of her "Response to De[f]endant's Undisputed Statement of Material Facts." Again, none of the factual allegations contained within ¶ 1 of Elliott's response specifically controverts American's allegation that Elliott *testified* that she knew she was required to use up her vacation time before taking unpaid FMLA leave. Paragraph 1 of Elliott's response never alleges that Elliott did not so testify and therefore does not controvert this statement.

away from work as either vacation time or FMLA leave on her timecard. Instead, she recorded all her missed time as time she had worked—"compensable" time.

On May 31, 2005, Rodney Blake and Devin Thompson met with Elliott to discuss her job performance. Thompson had twice previously asked Elliott to provide him with a copy of her attendance, vacation and sick time as recorded. Elliott had failed to do so. Blake and Thompson spoke to Elliott about Thompson's two prior requests.[6]  Thompson asked Elliott to provide her time sheets by the end of business on June 3, 2005.[7] In response to Thompson's request, Elliott suggested that Thompson retrieve her time records from LeAnn McNallie, the secretary responsible for inputting time for support staff. Elliott also stated that she was aware of American's policy regarding reporting time and denied ever mis-logging her time. Elliott later testified that at the time this meeting took place she was aware that her time and attendance records were being questioned by management. However, Elliott elected not to change the manner in which she recorded her time. Elliott testified that as of May 2005 she owed the company at least twenty-eight to twenty-nine hours worth of time.

---

[6]Elliot attempts to controvert this statement with ¶ 4 of her "Response to De[f]endant's Undisputed Statement of Material Facts." The only statement contained within  ¶ 4 that pertains to American's allegation is this: "Plaintiff was counseled, however; that was not the real *motivation* behind her counseling." American, however, makes no reference to the *motivation* behind her counseling session. American simply states that a meeting took place and describes the subjects covered during that meeting. Elliot makes no factual allegations in ¶ 4 suggesting that this meeting did not take place as described.  Therefore, American's allegation is deemed admitted for the purposes of this motion.

[7]Elliott attempts to controvert ¶¶ 20-22, 24-30, 32-40, and 43-48 of American's "Undisputed Statement of Material Facts" with ¶¶ 1 and 4 of her "Response to De[f]endant's Undisputed Statement of Material Facts." It is clear, however, that Elliott simply does not understand LCvR 56.1(c)'s requirements. Paragraphs 1 and 4 clearly do not allege *facts* specifically controverting ¶¶ 20-22, 24-30, 32-40, and 43-48.  For example, ¶ 20 of American's statement describes what Devin Thompson requested of Elliott at their May 31, 2005, meeting. To controvert this statement, Elliott must allege facts showing that Thompson did not in fact request those things of Elliott at that meeting. Elliott fails to do so. Having so failed, Elliott is deemed to have admitted this statement of fact.

Without addressing each and every one of Elliott's numerous unsuccessful attempts to controvert American's statement of facts, the Court instead simply concludes Elliott is deemed to have admitted each of the uncontroverted facts for the purposes of this motion.

4

On July 15, 2005, Elliott met with supervisors a second time regarding her job performance. Because Elliott did not give him her time records like Thompson had requested at their first meeting, Thompson had retrieved Elliott's time record for June from LeAnn McNallie. Thompson gave Elliott the opportunity to review the time sheets he had gotten from McNallie to confirm they were the records Elliott had turned in. Elliott confirmed the records were the records she had turned in. Elliott was then asked if there were any discrepancies with the records, and she only noted one entry regarding a day in which she took vacation. Thompson had also noticed this discrepancy and had Elliott's gate entry and exit times for the month of June examined to determine if she had taken vacation as stated in a prior email or if she was at work. While reviewing Elliott's entry and exit times for the month of June, Thompson discovered that while Elliott had turned in 180 hours of time on her time sheets, she had actually only worked approximately 148 hours. Elliot's gate records also revealed that Elliott often took lunches lasting anywhere from an hour and forty-five minutes to two hours, which exceeded her thirty minute to one hour lunch period. Elliott was advised that there would be a follow-up meeting on July 29 to address her performance, and was instructed to come to that meeting with a plan to make up the thirty-two hours she had claimed she was working when she was not. Elliott was also advised that her time cards would be reviewed back to January 1, 2005, to determine whether she had accurately recorded her time. Elliott's supervisors also requested that she review her records during this time period for any discrepancies.

On July 27, 2005, Elliott met with Blake, Thompson, and Ashley Mattke from Human Resources to discuss the discrepancies between the time she recorded as "working" and the time her gate entry and exit records showed she was actually working. Elliott was asked if she could provide documentation showing that these times were actually vacation time, hours she had later made up,

or some other type of acceptable absence. Elliott was unable to do so. Shortly thereafter, Elliott wrote a letter to Ms. Mattke addressing the time recording issue. Elliott admitted there were problems with her attendance that needed to be corrected and offered to do whatever was necessary to correct the problem.

As a result of the time record discrepancies, Human Resources initiated an investigation to determine whether Elliott had committed time card fraud. Elliott was withheld from service with pay effective August 4, 2005, while Human Resources conducted its investigation. Human Resources concluded that Elliott committed time card fraud. Specifically, there were six days where Elliott reported that she worked an eight hour shift when she actually had not worked at all. The records also established that Elliott only worked three days that consisted of a full eight hour shift during the entire audited period of January 1, 2005 through June 30, 2005.

Based on the findings of the investigation, Rodney Blake decided to discharge Elliott on August 16, 2005, for violating American Rules of Conduct 16 and 34:

- Rule 16: Misrepresentation of facts or falsification of records is prohibited.

- Rule 34: Dishonesty of any kind in relations with the company, such as theft or pilferage of company property, the property of other employees or property of others entrusted to the company, or misrepresentation in obtaining employee benefits or privileges, will be grounds for dismissal and, where the facts warrant, prosecution to the fullest extent of the law

(Pl.'s Mot., Exhibit "P".)

Elliott later testified that she did not work forty hours each week as she had recorded on her time sheets. She further testified that she had no evidence to dispute the badge records showing the actual time she was present at work. Elliott admitted that her time records incorrectly showed that her attendance was perfect and that she was at work at least eight hours each day. Based on these

records, and their admitted inaccuracy, Elliott admitted she was guilty of violating American Rules of Conduct. Elliott further admitted that her time sheets did not accurately reflect what she was doing when she was away from work or what categories of absences actually occurred, and agreed that this was a violation of American's work rules. Elliott testified that when she was discharged she still owed time to the company because she had not made up all the time that she previously reported as compensable. Elliott testified that if she went back and recorded all of her time away from work as FMLA leave, as opposed to compensable time, she would still owe money to American. Finally, Elliott conceded that if she had followed American's work rules, her termination would not have occurred.

**B. Procedural Background**

Elliott filed suit in Tulsa County District Court on March 7, 2007. American removed the case to this Court on May 14th, 2007. Elliott's original complaint included claims for intentional infliction of emotional distress, race discrimination, and age discrimination. Elliott has since dismissed those claims [Docket No. 28] and now proceeds with only her claim that American fired her in retaliation for her exercising of rights under the FMLA and her claim that American interfered with her rights under the FMLA.

American filed the instant motion for summary judgment on December 3, 2007. American claims Elliott: (1) cannot establish a causal connection between her FMLA request and subsequent termination, and (2) cannot establish that American's proffered reasons for terminating her are pretextual. Plaintiff disputes both contentions and argues that summary judgment should be denied.

<u>**DISCUSSION**</u>

Summary judgment is proper where the pleadings, depositions, answers to interrogatories,

and admissions on file, together with affidavits, if any, show there is no genuine issue as to any material fact, and the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(c). In making the summary judgment determination, the Court examines the factual record and draws reasonable inferences therefrom in the light most favorable to the non-moving party. *Simms v. Oklahoma*, 165 F.3d 1321, 1326 (10th Cir. 1999).

Under Rule 56(c), the moving party has the initial responsibility to show that "there is an absence of evidence to support the nonmoving party's case." *Celotex Corp. v. Catrett*, 477 U.S. 317, 325 (1986). If this requirement is met by the moving party, the burden shifts to the nonmoving party to make a showing sufficient to establish that there is a genuine issue of material fact regarding "the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Id*. at 322.

If the non-moving party can prove the existence of a genuine issue of material fact, the motion is defeated. An issue is "genuine" if the evidence is significantly probative or more than merely colorable such that a jury could reasonably return a verdict for the nonmoving party. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). A fact is "material" if proof thereof might affect the outcome of the lawsuit as assessed from the controlling substantive law. *Id.* at 249.

**A. Elliott's Retaliation Claim**

To establish a prima facie case of retaliation under the FMLA, Elliott must show that: (1) she engaged in a protected activity; (2) American took an action that a reasonable employee would have found materially adverse; and (3) there exists a causal connection between the protected activity and the adverse action. *Metzler v. Federal Home Loan Bank of Topeka*, 464 F.3d 1164, 1171 (10th Cir. 2006).

8

Once a prima facie case of retaliation is established, the burden shifts to American to articulate a legitimate, non-retaliatory reason for Elliott's termination. *Metzler*, 464 F.3d at 1172. If American can do so, the burden shifts back to Elliott to produce evidence showing American's proffered reason is a pretext for the retaliatory reason. *Id.* "A plaintiff can demonstrate pretext by showing weaknesses, implausibilities, inconsistencies, incoherencies, or contradictions in the employer's reasons for its action, which a reasonable fact finder could rationally find unworthy of credence." *Richmond v. ONEOK, Inc.*, 120 F.3d 205, 209 (10th Cir.1997).

### 1. Causal Connection

American alleges Elliott has failed to establish the requisite causal connection between her alleged exercise of rights under the FMLA and her termination. To establish a causal connection, Elliott "must show that the individual who took adverse action against her knew of the protected activity." *Williams v. Rice*, 983 F.2d 177, 181 (10th Cir. 1993). The causal-connection inquiry then focuses on whether the individual who took adverse action treated Elliott differently than they would have if she had not engaged in protected activity. *See Mickelson v. New York Life Ins. Co.*, 460 F.3d 1304, 1318 (10th Cir. 2006). If a causal-connection is not shown, the retaliation claim must fail because the FMLA does not insulate an employee from being fired for reasons unrelated to their taking of FMLA leave. *Gunnell v. Utah Valley State Coll.*, 152 F.3d 1253, 1262 (10th Cir.1998).

First, American claims Rodney Blake—the individual at American who terminated Elliott—was not aware Elliott was exercising her rights under the FMLA because Elliott never recorded any time on her timecard as FMLA leave. In response, Elliott claims that Blake told her to take time off whenever she needed it, record the time as worked, and then "make up" the time by working extra hours later.  Elliott claims that although she was recording her absences as paid time,

9

as opposed to unpaid FMLA leave, she was actually utilizing FMLA leave. Elliott therefore claims that Blake knew she was exercising her rights under the FMLA.

The Court believes there exists a fact issue as to whether Blake did or did not know that Elliott was attempting to exercise her rights under the FMLA. Therefore, the Court cannot conclude that Blake was unaware she was exercising her rights, as American claims.

Even assuming that Blake did know that Elliott was attempting to exercise her rights, American argues that the requisite causal connection still does not exist because Elliott was fired for a reason unconnected to her attempted exercise of FMLA rights. Thus, American argues that Elliott would have been fired whether or not she was engaged in protected activity. American argues that it terminated Elliott solely because she recorded on her time sheets that she was at work when she was not. American thus alleges that Elliott's dishonesty created grounds for termination wholly unrelated to the FMLA.

The Court agrees. Although Elliott argues she was fired for taking time off to care for her mother, American has never claimed Elliott was terminated for taking time off and nothing in the record suggests to the contrary. The undisputed facts clearly show that Elliott was fired not because she took time off work to care for mother, but because she took time off work and then claimed the time as compensable so that she would be paid for time she had not actually worked.[8] American's proffered reason for firing Elliott would exists whether the time Elliott was missing work was for vacation, illness, or to take care of her sick mother. Therefore, Elliott cannot establish the requisite causal connection between her firing and her alleged exercise of her right to FMLA leave.

---

[8]The Court should note that its causal connection analysis is quite similar to its pretext analysis and requires an assessment of evidence typically considered in that later phase of the analysis. Regardless of the interlocking nature of the two stages of the inquiry, at each stage the Court considers all evidence probative of the issue before it.

The undisputed factual record clearly establishes that there exists no causal connection between Elliot's firing and her exercising of her rights under the FMLA. In the absence of such a causal connection, Elliott has failed to establish a prima facie case of retaliation and her retaliation claim cannot survive summary judgment.

### 2. Pretext

Even assuming, *arguendo*, that Elliott has in fact established a prima facie case of retaliation, American has come forward with a legitimate non-discriminatory reason for Elliott's termination: she failed to follow American rules requiring her to accurately record her time worked. Having come forward with this reason, the burden shifts back to Elliott to produce evidence showing American's proffered reason is pretextual. Elliott has failed to do so. In her response to American's motion, Elliott offers what she calls "ample evidence of pretext." However, none of the evidence Elliott offers has *any* tendency to show "weaknesses, implausibilities, inconsistencies, incoherencies, or contradictions" in American's proffered reason for terminating her. In fact, Elliott's pretext argument focuses on whether or not her supervisor Blake knew she was taking time off to care for her mother. Such evidence is simply irrelevant to the question of whether American's reason for firing Elliott was pretextual. The undisputed factual record clearly establishes American had granted Elliott FMLA leave in the past, and had authorized Elliott to take FMLA leave in this instance. It it simply illogical to conclude that American suddenly decided to fire Elliott for taking the very leave it had authorized, and had readily permitted in the past. Therefore, even had the Court concluded Elliott had established her prima facie case, the Court would find that Elliott has failed to meet her burden of proving pretext.

**B. Elliott's Interference Claim**

To establish a prima facie case of interference under the FMLA, Elliot must show that: (1) she was entitled to FMLA leave;[9] (2) some adverse action by her employer interfered with her right to take FMLA leave, and (3) the employer's action was related to the exercise or attempted exercise of her FMLA rights. *Jones v. Denver Pub. Sch.*, 427 F.3d 1315, 1319 (10th Cir. 2005).

First, American argues it never interfered with Elliott's right to take FMLA leave. American argues that, as a threshold issue, Elliott has failed to establish she ever actually utilized the FMLA leave it had approved. Having examined the record, it is clear that Elliott never characterized the times she was missing work as FMLA leave when recording her time on her timecards— despite the fact that there was a place on her timecard where she was required to "code" her time off as "FMLA" or otherwise. Additionally, Elliott's own testimony establishes she never submitted her time away from work as FMLA leave, and that she only requested approval for FMLA leave to "protect" herself:

> Q.    If you were taking time off for caring for your mother and accounting for it as comp time as opposed to FML, explain to me why you went to the trouble of requesting FMLA leave?
>
> A.    So that my time that I took off with my mother, its like a safety precaution so that they can't use it against you. It doesn't count against your attendance.
> ...
>
> Q.    But if you weren't submitting anything as being FMLA time, what did it matter to you since you were taking off as much time as you wanted anyway?
>
> A.    . . . The family medical leave thing was basically just a protection thing.

(Pl.'s Mot., Exhibit "B" p. 72, ln. 14-21; p. 92, ln. 7-9, 19-20.)

_____

[9]The parties agree that Elliott was entitled to FMLA leave.

12

Even assuming that the Elliott's time away from work can be characterized as FMLA leave, American argues it readily approved Elliott's request for FMLA leave and never prevented Elliott from taking time off to attend to her mother. American argues that Elliott has admitted as much in depositional testimony:

> Q.      Okay. We'll look at the forms you filled out and everything like that a little later, but focusing on your claim against violation of the Family Medical Leave Act, was there a single time, a single time that you can think of that American Airlines did not let you take off work in order to attend to your mother under a family medical leave scenario?
>
> A.      That they allowed me to take off?
>
> Q.      That they did not allow you?
>
> A.      No.

(Pl.'s Mot., Exhibit "B" p. 36, ln. 24-25; p. 37, ln. 1-8.) This admission is fatal to Elliott's interference claim. Because the undisputed factual record clearly shows that, prior to her termination, American never prevented Elliott from taking time off to care for her mother, Elliott's argument is presumably that the interference occurred when she was fired. As the Court previously explained, the undisputed facts clearly show that Elliott was dismissed not because she took unpaid FMLA leave, or was attempting to take FMLA leave, but because she made false statements on her timecards. Therefore, Elliott has not established that her termination was related to the exercise or attempted exercise of her FMLA rights. Without that causal connection, Elliott's firing cannot qualify as interference. Therefore, Elliott must show some other act of interference on the part of American. Elliott has failed to do so. Indeed, the undisputed factual record and Elliott's own admissions show that American never interfered with her taking of FMLA leave at any time prior to her firing.

13

Therefore, Elliott has failed to establish a prima facie case of interference and her interference claim cannot survive summary judgment.

## **CONCLUSION**

For the reasons set forth herein, Defendant's Motion for Summary Judgment is GRANTED.

IT IS SO ORDERED.

James H. Payne
United States District Judge
Northern District of Oklahoma